[Civ. No. 5047.   Third Appellate District.—November 26, 1934.]

P. J. ROWLAND et al., Respondents, v. COLUMBIA MINING, WATER AND POWER COMPANY, OF CALIFORNIA (a Corporation), Appellant.

O. F. Meldon, Halverson & Halverson and White, Miller, Needham, Harber & Mering for Appellant.

Rowan Hardin and Grant & Zimdars for Respondents.

PLUMMER, J.—The plaintiffs had judgment against the defendant for and on account of alleged fraudulent representations concerning certain mining property situate in the county of Tuolumne. From this judgment the defendant appeals.

The complaint alleges that the defendant at the time of the commencement of the action was and for many years previously had been the owner of certain mining property consisting of the river bed of the south fork of the Stanislaus River just above the forks of said river with the north fork, and commencing at a point on the bed of the south fork of the river immediately beneath the point where the power line of the Pacific Gas and Electric Company crosses the south fork of the river, and extending thence up the bed of the river approximately 2,000 feet to the easterly and northerly extremity of the property.

The property in question is alleged to be susceptible to mining operations during those periods when the river bed is not covered by water to such a depth as to prevent the working of the ground for mining purposes.

It is further alleged in the complaint that on the sixteenth day of April, 1926, and on many days prior thereto the defendant corporation, through its officers, stated and represented to the plaintiffs, for the purpose and object of inducing these plaintiffs to enter into a contract for the working of said mining ground so owned by said defendant corporation, that the ground had never been mined for gold or precious metals, and was valuable for mining purposes because of the gold contained therein.

It was further represented, according to the complaint, that said river bed had not been worked on account of the depth of the water flowing over the same, but that since the recent building of a certain dam in said river by the Pacific Gas and Electric Company, and diverting the water

from said stream, it was possible to mine the river bed referred to. The complaint further alleges that representations and statements were made that the gold to be extracted from the premises would afford large returns and compensation for the money expended in mining the same. It is further alleged that the plaintiffs relied upon the statements that said ground had not previously been worked, and that no mining operations had been carried thereon, save and except along the banks of said river above low-water mark; that the representations were untrue; that the plaintiffs, relying upon the representations, and believing that the same were true, entered into a lease with the defendant corporation for the carrying on of mining operations on said property, and expended large sums of money in such operations; that the returns for such operations amounted to only the sum of $10, and that after the beginning and carrying on of mining operations in the bed of said river the plaintiffs discovered, by the finding of shovels, nails and other objects on the bedrock of said river, that the premises leased from the defendant had previously been mined.

It is further alleged that the defendant knew that said representations and statements as to said mining premises not having been previously worked, were untrue, and were made for the purpose of inducing the plaintiffs to enter into the lease for the operation of said premises.

The lease entered into between the plaintiffs and the defendant, set out in the record, is quite lengthy, but in substance it provided for the plaintiffs raising so much money to begin operations and to conduct mining operations upon the premises referred to, yielding to the defendant a certain percentage of the gold that might be secured as a result of such mining operations.

In pursuance of the lease just referred to the plaintiffs entered upon, and conducted mining operations, and expended in so doing a sum of money somewhat in excess of $15,000, when the explorations revealed the fact that the premises covered by the lease had been formerly mined.

Upon this appeal two propositions are presented for consideration in the statement of questions involved, to wit:

### I.

"May one rely upon a merely speculative representation concerning an undertaking that is known to be hazardous and uncertain, where the speaker is known not to have any expert qualifications concerning the subject-matter, and where the source of the speaker's information was made known by the speaker to the one alleged to be defrauded?"

### II.

"Where the speaker makes known his source of information concerning the representations, and the one alleged to be defrauded investigates these sources without hindrance, may the plaintiffs rely upon subdivision 2 of section 1572 of the Civil Code as a basis of an action for fraud, especially where the representations concern a mining venture, where it is not claimed that the speaker had any expert knowledge?"

As we read the record, the foregoing statement of the questions involved is not strictly accurate. If the questions presented involved simply the opinion of the speaker as to the value of the property, or of the minerals contained therein, then and in that case the statement of the questions involved might be considered as correct. However, where the record shows a statement of a fact which involves an unworked placer mine in a district where large returns have been obtained in what is called "virgin ground", an entirely different situation is presented from a mere statement or declaration as to the value of a quartz mining claim, or even of a placer mining claim where large values have not been obtained from adjoining properties. The fact that property so situate has not been previously worked in order to obtain the minerals therein contained, is the leading factor, we think, in determining whether one would or would not embark in the undertaking of mining such property. The statement that such property has not been worked is a statement of a fact, and is in no sense of the word a statement of an opinion.

A reading of the complaint leads us to the conclusion that the defendant's demurrer thereto was properly overruled.

That the testimony is sufficient to support the finding of the trial court as to the statement of fact that the

property had not been worked, and that the plaintiffs relied upon the statement, and that it constituted actionable fraud as defined in subdivision 2 of section 1572 of the Civil Code, we quote both from that given by the defendant as well as that introduced on behalf of the plaintiffs:

W. H. Mahony testified that he first went upon the property in question in 1882, when it was owned by a Mr. Estee, a friend of his; that he had been interested in the property about 20 years; that since knowing the property he had sought information from old-timers, many of whom were then alive, who had worked about the river, and he had formed the definite conclusion that the part of the Stanislaus River he subsequently leased to plaintiffs had not been mined; that the defendant corporation had owned the property since 1923; that he carried on the negotiations by virtue of authority given to him in a resolution adopted by the corporation; that he was the president and manager of the defendant corporation; that he showed plaintiff Rowland letters from persons who had examined the property, and told Rowland that in times past mining operations could not be carried on in the south fork of the Stanislaus River because of the large flow of water, and that the water formerly flowing in the river had now been diverted. Mr. Mahony also testified that he had talked with a Mr. Napoleon, an old-timer, who told him that the river had never been worked below ''Nigger Gulch'', and that Mr. Smith had said the same thing. Mr. Mahony further testified that he never heard of the Boronio claim until the testimony of Mr. Napoleon at the trial of the instant case. (Nigger Gulch mine is just above and up the river from the property leased to the plaintiffs.)

Mr. Napoleon's testimony upon this subject is as follows: That he had lived in the neighborhood of Columbia since 1853, and had known Mr. Mahony for 18 or 20 years, and had frequently seen him during that time; that he had talked with Mr. Mahony on many occasions about the south fork; that he knew the south fork had all been mined out, except the Boronio and Spring claims. The Boronio claim was at the juncture of the south fork and middle fork of the main river, and about 200 feet up the south fork from the south line of the middle fork, and was below and

down the stream from the Pacific Gas and Electric power line, and that the south fork of the river above the Pacific Gas and Electric power line had been mined out, except the Spring claim, which was about a mile farther up the south fork.

Napoleon also testified that Ben Zachary mined the river below the Boronio claim, and this mined-out ground was the ground leased to plaintiffs, and that the Texas-Boronio claim was worked by the Knox Brothers. Referring to the leased property the witness testified as follows (to inquiries propounded by the court) : "Q. Is that the part of the river that you told Mr. Mahony had been mined out? A. This here above, yes sir. Q. This above the transmission line or the south fork, is that correct? A. Yes sir."

Upon cross-examination it appears that the witness Napoleon testified as follows; to a question by Mr. Mahony whether the south fork above the forks of the river except the Boronio claim had been mined out, Mr. Napoleon answered: "I may have told you that; that it had been mined; and if I didn't tell you, I will say now that it was."

Preceding the execution of the lease Napoleon testified, further, that Mr. Mahony had driven up to his place with the plaintiffs; that the plaintiffs stayed outside while Mr. Mahony came in to see him, and that Mr. Mahony said he had his parties and they seemed highly pleased and wanted him to tell them what he knew about the claim. Mr. Napoleon said he recommended the Boronio claim. The testimony further is that at this meeting with Mr. Napoleon which had been arranged by Mr. Mahony, and at which Mr. Napoleon recommended the Boronio claim as a good claim, Mr. Mahony said to plaintiffs Rowland and Charles Scanlan, Sr.: "You have just heard what Mr. Napoleon had to say about the Boronio claim never having been worked. The property I have proposed to lease to you gentlemen is a part of this Boronio claim." Napoleon stated that Mr. Rowland then said that he was satisfied.

All of the plaintiffs testified, in substance, that they invested their money in the project upon the statements that the property leased to them had not been mined, except on the rims, and that the gravel below the water level and on bedrock was what is called "virgin ground" or ground that

had never been worked, and that if they had not placed reliance upon the statements made to them by Mr. Mahony, they would not have spent any money on the project.

Mr. Rowland testified that Mr. Mahony told him that he had known the property for a long time, and during that time the property had never been worked; that he had showed him letters of different persons who had examined the property, and explained, in times past mining operations could not be carried on in the river there because of the large flow of water; that the amount of the water flowing in the river had been greatly reduced through the construction of dams for power purposes; and that the water formerly flowing in the river had been diverted. Mr. Rowland also testified that Mr. Mahony was emphatic in saying that the bed of the river had never been worked; that during the last few years the Pacific Gas and Electric Company had built a dam and diverted the water from the south fork of the river so that the ground could be worked. The other plaintiffs testified to substantially the same facts. Mr. Rowland further testified that he wanted first to prospect the ground, but Mahony objected to this and assured him that there was no need of so doing.

The testimony also shows that the plaintiffs knew practically nothing of mining placer claims, and that in the operations under the lease the plaintiffs expended the sum of $15,251.87, including wages and salaries. Of this amount the court found that the sum of $14,200 was properly expended by the plaintiffs for equipment and mining operations upon the leased premises.

From the testimony given by Napoleon the court could not conclude otherwise than that Mahony had given Napoleon to understand that the land about to be leased to the plaintiffs was the Boronio claim which had never been worked, whereas in truth and in fact the premises leased did not include any portion of that claim, but were situate farther up the river.

Irrespective of what Mahony may have believed, we think his representations came squarely under the provisions of subdivision 2 of section 1572 of the Civil Code, which reads: "The positive assertion, in a manner not warranted by the information of the person making it, of that which is not

true, though he believes it to be true." Such a statement by the section referred to constitutes actual fraud and lays the basis for the recovery of damages.

A number of cases are cited by the appellant which have to do with representations as to the value of quartz mining claims, but those cases are not controlling here, for the simple reason that the representation in the instant case does not rest upon the question of value. The representation was a statement of a fact that the property had not been previously mined.

We think the rule applied in the following cases is pertinent to the questions here presented:

In the case of *Edge* v. *Bryan*, 47 Cal. App. 312 [190 Pac. 476], in an action for fraudulent representations, the court held as follows (quoting from syllabus): "A representation by the vendor to the vendee that the land agreed to be sold was virgin soil, was an expression of fact, and not one of opinion, where, on being asked what 'virgin soil' meant, the vendor said that it had been a sheep pasture and never cultivated."

To the same effect are the cases of *French* v. *Freeman*, 191 Cal. 579 [217 Pac. 515], *Teague* v. *Hall*, 171 Cal. 668 [154 Pac. 851], and *Stone* v. *McCarty*, 64 Cal. App. 158 [220 Pac. 690], where the question of representations was thoroughly considered by this court. In the case of *Stone* v. *McCarty, supra*, the representations were made as to the quality of the soil, trees growing thereon, the selling price of the trees, etc. Other cases might be cited to the same effect showing the difference between the statement of a fact and the expression of an opinion. Ordinarily, expression of the value or the profits to be obtained are expressions of opinion, but the expressions of what has, or what has not been done with the property constitute statements of facts.

It appears from the record that the plaintiffs entered into an agreement with E. S. Garrett and A. B. Chapman, by virtue of which agreement Garrett and Chapman advanced to the plaintiffs the sum of $6,600. Their compensation for so doing was to receive a certain percentage of the gold that might be obtained from working the leased premises. In considering this agreement the court made the following finding:

"That it is true that plaintiffs secured $6,600.00 of the funds expended by them, as herein found, from one E. S. Garrett and one A. B. Chapman, under arrangements and agreements made between plaintiffs and the said Garrett and Chapman, but that said defendant did not in any wise participate or have any concern in said agreements and they were purely and simply transactions between the plaintiffs and said Garrett and Chapman; nor was there any agreement of any kind between the said Garrett and Chapman, or either of them, and the defendant, relative to the said $6,600.00 or any part thereof so secured by plaintiffs from Garrett and Chapman; and said agreement so made between the plaintiffs and said Garrett and Chapman did not entitle the said Garrett and Chapman to any active participation in the mining operations nor did it create any contractual relation of any kind whatsoever between said Garrett and Chapman, or either of them, and the defendant."

This sum was included in the judgment awarded to the plaintiffs. The finding itself shows conclusively that the defendant had no negotiations with either Garrett or Chapman. The finding does not show that the plaintiffs are obligated to repay Garrett or Chapman any moneys whatever on account of such advances.

The respondents argue that the plaintiffs agreed to repay Garrett and Chapman out of any moneys recovered. The record does not bear out such argument. Garrett and Chapman, as we have said, could look only to the gold that might be recovered for repayment or compensation for moneys advanced in aid of the enterprise. The finding itself, we think, shows conclusively that the sum of $6,600 should not have been included in the judgment.

The appellants make the further contention that there is no evidence supporting the finding of the court relative to the sum of $4,819.68, charged for equipment placed on the premises, and that the judgment is excessive in such amount. In making this contention appellants overlook the specification of errors. A reference to the record shows that no specification of errors as to the insufficiency of the evidence to support the findings of the court is set forth, save and except as to certain matters set forth in finding No. 1. These specifications are as follows: That

Mahony was one of the principal stockholders; that Mahony had not represented that the ground was virgin ground or had not been mined before; that no representations of fact were made by the defendant; that there is no evidence that the plaintiffs relied upon any statements of fact made by the defendant; that the evidence shows that the representations of fact made by the defendant were true; that there is no evidence that any representations of fact with reference to the previous conditions of the river were untrue; that the evidence does not show that the ground in the river bed below low-water mark had ever been mined; that there was no evidence to show that the plaintiffs expended the sum of $14,200, or any greater sum than $8,200; and that the evidence further showed that of the moneys actually advanced by the plaintiffs $1800 was withdrawn as salaries for Rowland and Charles Scanlan.

The finding as to the equipment was contained in finding No. 4, to which no specifications of error are addressed, nor is there any specification of any lack of testimony in any of the findings to support the item referred to. While there is a specification that the sum of $8,200 is all that is shown by the testimony to have been expended, there is no specification as to the different items, save and except as to the $1800. The court eliminated from some item the sum of $1,051.87. Just what item was reduced in this amount the record does not disclose.

Under the provisions of section 648 of the Code of Civil Procedure this court is precluded from considering the want of testimony to support a finding where there is no specification of errors setting forth such fact in the record. The rule is well settled that an appellant may not question the sufficiency of the evidence to support the findings where the appeal is presented upon a bill of exceptions, and the bill contains no specifications of the want of testimony to support the findings. (*Latta* v. *Da Roza*, 100 Cal. App. 606 [280 Pac. 711, 281 Pac. 655]; 2 Cal. Jur., p. 708; *Akley* v. *Bassett*, 189 Cal. 625 [209 Pac. 576]; *Schultz* v. *City of Venice*, 200 Cal. 50 [251 Pac. 913].)

As to the salary of two of the plaintiffs, the record shows that they gave up positions where they were earning such salaries, in order to engage in mining operations upon

the leased premises. The loss of this salary would certainly be a damage occasioned by the entering into of the lease referred to, based upon the statements and misrepresentations made by the president of the defendant corporation.

It follows from what we have said that the judgment should be reduced by striking therefrom the sum of $6,600, and it is so ordered. This leaves the amount to which the plaintiffs are shown to be entitled to recover, the sum of $7,600, and as to that amount the judgment is affirmed.

The respective parties will defray their own costs on appeal.

Pullen, P. J., and Thompson, J., concurred.