J. C. MILLETT CO.
v.
PARK & TILFORD DISTILLERS CORP.
No. 31815.

United States District Court,
N. D. California, S. D.
July 2, 1954.

J. Albert Hutchinson, San Francisco, Cal., for plaintiff.

McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, Cal., for defendant.

MURPHY, District Judge.

This is an action originally brought by plaintiff, a California Corporation, in the State Court on four separate causes of action. Generally stated, the first and second causes of action allege breach by defendant of respectively, an implied and express contract for the distribution of defendant's products. The third alleges fraud in the procurement of the contract. The fourth asks for an injunction, an accounting and other relief based on alleged unfair competition of the defendant. The case was removed to this Court on the ground of diversity jurisdiction. Plaintiff's motion for a preliminary injunction based on the fourth cause of action was denied by Judge Roche.

The parties became enmeshed in interrogatories and procedural motions to the extent that the discovery proceedings were terminated by order of this Court and the case set for pretrial conference. Defendant's motion for summary judgment came on for hearing at that same time. Judge Goodman ordered that only the issues relating to the liability of Park & Tilford would be determined at a preliminary trial. The ruling on defendant's motion for a summary judgment was reserved to the preliminary trial.

Pursuant to this order, the issue of defendant's liability was tried before me without a jury.

The major issues in this suit hinge upon the character of the relationship of the parties under which it is conceded plaintiff bought defendant's products as a wholesaler and resold them to retail outlets. It is likewise agreed by both parties that this relationship existed for only about seven months and was terminated by the defendant.

The arrangement under which plaintiff sold defendant's products arose wholly out of oral conversations extending from September, 1951 through January, 1952. Both parties were represented by men of long experience in the liquor business. Very few details were discussed but plaintiff expressly agreed

to take on the "distributorship" of defendant's products.

The factual setting of the parties and the condition of the industry at that time must necessarily be set out if the discussions are to be understood.

Plaintiff, J. C. Millett Company, (hereinafter referred to as Millett) is a California Corporation licensed as a wholesale distributor and importer of alcoholic beverages which has been actively engaged in the business since the repeal of prohibition. It engages in this business in eleven northern counties in California through three divisional offices, one in San Francisco, one in Oakland and a third in Salinas.

Defendant, Park and Tilford Distillers Corporation, (hereinafter referred to as Park & Tilford) is a Delaware Corporation which manufactures and imports from abroad, alcoholic beverages. Its products are trade marked and such products are unavailable under such trade names from any other source. It engages in business in California and in this District.

Millett, in common with other liquor distributors in Northern California distributed various "lines" of alcoholic beverages. Within the trade a "line" is the aggregate of various types of distilled spirits bottled in different sizes, which are sold in a group to a wholesaler by a particular distiller.

Park & Tilford have a wholesaler's license in California and they do much of their own wholesaling in the Los Angeles area. But in Northern California for a substantial period of time prior to the negotiations they had dealt solely through two distributors and did not then and do not now sell to any one else.

In late 1950 and in 1951 the liquor distributing business was in a critical and transitional period. Competition was keen. It was a buyer's market. Prior to this time most distributors in this area had done business without any written contracts regarding duration or termination of their distributorships. The distillers would give no such contracts. The Wines and Spirits Wholesalers of America, an association of liquor wholesalers had been trying to get termination contracts from the distillers for about four years. By October 1951, many distillers did business without written contracts but some had obtained written contracts of varying provisions. Some contained exclusive "dual" or "three way" distributorships. There were written contracts containing only a provision for termination by either party on notice or at a stated time after. But such contracts were hard to get. On most of the business handled by Millett there were no such contract provisions.

During this period distillers were changing their distributors. National Distillers, for whom Millett had distributed for many years, in early 1951 had "cut off" its distributors "to go exclusive" with Max Sobel. One of Park & Tilford's two distributors, Tonklin & Modlin, was also affected by this change. In fact, they were going out of business and had published this fact to the trade. There were rumors that Kinsey, which after the loss of the National Distillery, was Millett's largest "line", was going to drop Millett. Park & Tilford wanted another distributor to take Tonklin & Modlin's place. They were looking over the distributors in this territory.

It was in this posture that discussions between Mr. J. C. Millett, president and principal stockholder of Millett and Mr. Harry Herting, District Manager, Northern California for Park & Tilford, began. In September an informal and wholly inconclusive discussion took place. With the arrival in San Francisco in early October 1951 of Mr. Benjamin Cooperman, Park & Tilford's newly appointed Western Division Manager, the negotiations began in earnest.

Mr. Millett began the discussions for plaintiff but became ill in the middle of October and the talks were continued by Mr. William Loviner, the manager of Millett's San Francisco Branch. Cooperman and Herting represented Park & Tilford. From October to January they

met about four times. The primary topic which filled the discussions was the problem of duration and termination. This problem was discussed at all their meetings. Millett and later Loviner communicated to Cooperman that Millett had been hurt in the past by distillers terminating their distributorship and would not consider taking on the Park & Tilford distributorship unless they had protection against termination. They requested a one year termination agreement and at another time a five year termination agreement. Cooperman told the Millett people that to his knowledge Park & Tilford had no such contracts. Cooperman told them repeatedly that Millett needed no such contract; that Park & Tilford was a fine company; that never in the history of the company had Park & Tilford "cut off" a distributor. He cited examples in the San Francisco area, one of them Tonklin & Modlin, where Park & Tilford had continued to sell to distributors who were not performing well. Initially, Millett did not desire to take on the Park & Tilford line. He had other commitments. Loviner so informed Cooperman. But Cooperman replied that he had looked over the other distributors in the area and Park & Tilford wanted Millett. The discussions continued. Loviner continued to ask for a contract regarding termination. Cooperman told him that he would try to get such a contract; that he did not know what he could do and that he would have to take it up with the New York office. He reasserted that Millett needed no such contract for Park & Tilford never "cut off" a distributor. Millett agreed to become the distributor. This was based in large part on Cooperman's representation regarding continuity—but also on the fact that Millett was losing the Kinsey line. Cooperman went to New York to discuss the contract provision regarding termination and Millett's credit. While there Mr. Harry Herrfeldt, Park & Tilford's Vice President and Sales Manager, told him that Park & Tilford had no such contract and would not

enter into one. But upon having Millett's credit checked he told Cooperman to go back and sell Millett merchandise.

Upon his return to San Francisco Cooperman told Loviner that he could not get the desired termination contract but the program was "all set to go". He told Loviner that he need not worry; that Park & Tilford would continue to sell their merchandise to Millett so long as they did a satisfactory job.

On January 8, 1952, an initial order for $143,532.02 worth of merchandise was written up. Since boat shipments of merchandise from the East took 21 days and overland shipments 7 to 14 days, Cooperman and Herting arranged with Loviner for Millett to buy $52,512.-80 worth of this merchandise from Park & Tilford's two local distributors.

Millett began to sell Park & Tilford products at each of their branches. Monthly depletion reports showing the amounts of each particular item sold were sent to Herting. This is a normal procedure in the trade. Loviner and Herting discussed ways of making the depletion greater. Millett ordered merchandise from Park & Tilford to fill up its supply of depleted items. Park & Tilford sent out information to Millett and its other distributors as to what particular items were to be pushed during a given period and allocated quantities of certain relatively scarce items among them. Herting discussed with the Millett people Park & Tilford's current marketing plans.

A sales representative of Park & Tilford attended Millett's sales meetings and gave its salesmen information and material to help them sell Park & Tilford merchandise. As is normal in the industry, this sales representative called upon retailers to solicit orders for Park & Tilford distributors. He did not take signed orders.

Herting worked closely with Millett to help Millett sell as many cases as possible. As Herting put it, "It is not easy to get a distributorship going".

The price to the wholesaler was set by Park & Tilford as was the price at which the retailers were to sell to the public. This is normal in the industry. In common with other distillers in the industry, Park & Tilford sent to its wholesalers a list of prices at which "the other wholesalers" were selling its products to the retailers. These prices, in accordance with State law, were posted by the wholesaler with the California State Board of Equalization in advance and published. These prices are adhered to in the industry.

The details of Millett's performance aside for the moment, the facts regarding the termination of the distributorship are clear. In April of 1952 Herrfeldt called on Loviner in San Francisco. Herrfeldt told Loviner that Park & Tilford wanted to "call it quits". When asked he assigned no reason other than that the two organizations were "incompatible". He would give Millett 30 or 60 days to wind up the distributorship. Loviner insisted that Park & Tilford had no right to terminate and after Herrfeldt saw Millett a decision on the matter was put off. Another meeting was had in May but no final decision was reached. In May Millett wrote Herrfeldt a letter stating in substance what Cooperman had told him regarding continuity in the earlier discussions and expressing the hope that the relationship would work out. Herrfeldt replied that he agreed that the decision in the matter was to be held in abeyance but that they would discuss the matter again on May 22nd after the Wholesalers' Convention in Los Angeles. While at the Convention Cooperman told Loviner and others that the difficulty had been ironed out and Millett would continue as distributor. Relying on this, the Manager of Millett's Salinas Branch did not undertake distribution of another line. The later meeting was not held.

On July 28, 1952, Cooperman and Herrfeldt told Loviner that effective July 31, 1952, Millett would no longer be a Park & Tilford distributor.

I will discuss first the causes of action based on contract. Since jurisdiction in this case is based solely on diversity of citizenship, the California substantive law controls.[1]

The basic issue is whether there was a contract governing the parties' general relationship and if so what were its terms. Since the primary breach alleged is the termination of the relationship, the controlling subissue is—what was the parties' agreement regarding the duration and the right to terminate?

The defendant argues that there was no contract at all. "There was merely an arrangement not amounting to a contract, under which plaintiff was given the privilege of distributing Park & Tilford products". Primary emphasis is on the fact that plaintiff's witnesses testified that nothing was said in the discussion by them about performance on Millett's part or what accomplishments were to be expected from the distributorship.

■ First, this testimony was directed toward whether the right to terminate the agreement was conditioned upon Millett's performance. They did not testify that Millett had no obligation under the contract. Secondly, and more important, contracts are often formed between business men of long experience in the trade and familiar with the relationship which they are undertaking, without explicit discussions of the details of promised performance. The parties here expressly, in words, agreed that Millett was to undertake the "distributorship" of Park & Tilford Products within a specified area. They all understood from the discussions that the arrangement was not a single sale but that it was to continue. The understanding in the trade as to what a distributorship encompasses,[2] its economic

1. Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. California Civil Code, §§ 1644, 1645; Watson Land Co. v. Rio Grande Oil Co., 1943, 61 Cal.App.2d 269, 142 P.2d 950.

function and business purpose,[3] and the later actions of the parties in pursuing this relation before any disagreement arose[4] are all entitled to great weight in determining their respective undertakings.

Millett was a liquor wholesaler in this area of long experience. He in common with other distributors maintained salesmen, storage facilities and possessed an organization whose method and purpose was directed toward selling alcoholic beverages to retail stores. Park & Tilford's economic life is dependent upon the sale of its products. In this highly competitive business the wholesaler's function is a necessity. Park & Tilford could have, as it did in Southern California, performed this function itself. But in Northern California it sold only through its distributors. After study of the other distributors in the area Millett was picked with another to sell its products. Park & Tilford's economic life in this area was entrusted into their hands.

The further development of a market for Park & Tilford products was of the essence of the agreement. Not only is this the economic *sine qua non* of the distributorship relation but it was so understood in the trade. The acts of the parties were designed to further it. The depletion reports and discussions between the parties about them, the orders to fill the depletions, the dissemination of Park & Tilford's market policies to its distributors, the help given Millett by Herting and the sales representative, were directed toward this end. Millett vigorously pursued their sale. In the words of Herting reporting to his home office: "* * * they (Millett) are

pounding the hell out of their salesmen and I think they are out to prove that they can sell twice as much Park & Tilford in the city as Juillard (Park & Tilford other distributor) can sell".

It is clear that Millett promised to do more than buy whatever amount of liquor it desired. In promising to take on the distributorship it promised to perform the essential economic function of that position, i. e., to use its corporate best efforts to promote the sale of Park & Tilford products. Necessarily, incident to that undertaking it agreed to maintain a sales force, warehousing facilities and inventory. Clearly implied was a convenant on the part of Park & Tilford to sell and upon the part of Millett to purchase and keep on hand a supply sufficient to meet the demand of this market.[5]

The fact that Millett was in contemplation of both parties to sell other distillers' products does not mitigate against its covenant to use its best efforts. The Park & Tilford line would not by itself support a distributor. Other distributors, even Park & Tilford distributors in the area, sold other lines. The trade understanding and the economic purpose of the distributorship relationship remains unchanged.

Nor does the fact that Millett placed an initial order with other Park & Tilford distributors have any probative value toward showing that Millett did not agree to buy the necessary products from Park & Tilford. The initial order was placed with the concurrence of Cooperman for the sole purpose of getting the distributorship under way immediately. All later purchases were made from Park & Tilford.

3. Universal Sales Corp. v. California, etc., Mfg. Co., 1942, 20 Cal.2d 751, 128 P.2d 665; Shelley v. Nichols, 1953, 120 Cal. App.2d 602, 261 P.2d 771; Bartel v. Associated Dental Supply Co., 1952, 114 Cal.App.2d 750, 251 P.2d 16; Jegen v. Berger, 1946, 77 Cal.App.2d 1, 174 P.2d 489.

4. Whalen v. Ruiz, 1953, 40 Cal.2d 294, 253 P.2d 457; Gillespie v. City of Los Angeles, 1950, 36 Cal.2d 553, 225 P.2d 522; Universal Sales Corp. v. California etc., Mfg. Co., supra, note 3; Wilson v. Corrugated Kraft Containers, 1953, 117 Cal.App.2d 691, 256 P.2d 1012.

5. See *Long Beach Drug Co. v. United Drug Co.*, 1939, 13 Cal.2d 158, 88 P.2d 698, 89 P.2d 386; Ross v. Frank W. Dunne Co., 1953, 119 Cal.App.2d 690, 260 P.2d 104; Cal. Civil Code, §§ 1655, 1656; Corbin on Contracts, sec. 155; Williston on Contracts, Revised Edition, Sec. 1027A.

█ The agreement is not fatally uncertain as to quantity. Bearing in mind the object of the contract—to promote the sale of Park & Tilford products—it is difficult to find a measure of the amount to be bought and sold more definite than the quantity that Millett could sell to the market it promised to endeavor to promote. Such promises as to quantity have been uniformly upheld by the California Courts [6] and generally elsewhere.[7]

This brings us to the controlling sub-issue. What was the contract provision regarding duration and termination? The issue is not did Park & Tilford reserve the right of unilateral termination. The parties were free to contract as they chose and this provision like the others must be found, if at all, from their negotiations.

Millett argues that Cooperman's representations created a perpetual distributorship. Park & Tilford argue that when Millett failed to get the express terms it asked for, the contract was terminable at will. They rest this argument upon the industry understanding regarding termination. As is not unusual—both parties here ask for too much and are willing to concede too little.

█ I find as a fact that no definite agreement on this issue was ever reached and that the distributorship was of indefinite duration.

█ The setting in which Cooperman's statements were made is critical to Millett's argument. Millett wanted and asked for a five-year and later a one year termination clause. Cooperman clearly informed Millett that he could not give such a contract, that it was necessary for him to go to New York. He later told them he could not get either provision they asked for. A construction of language granting a right to perpetual performance will be avoided unless compelled by unequivocal language.[8] Cooperman's representations that Millett would need no such contract because Park & Tilford had never cut off a distributor, could not have been understood as a promise of a perpetual distributorship however much these representations were relied upon in taking on the distributorship. Indeed, later Millett continued to ask for a specific termination provision.

On the other hand, there is no showing that the parties understood, or would have reasonably understood from their negotiations that the distributorship was terminable at will at any time. There was, at this time, no such industry custom. The changes and unsettling in the industry were founded in distributorship termination. Contracts had been obtained and distributors were endeavoring to obtain others. It is true that there was a shifting of distributors but many of those terminated had existed for substantial periods of time. The negotiations were directed primarily toward continuity. Both parties understood from the negotiations that the relationship was to continue. Millett made it clear that they would not take on the distributorship without assurance of continuity. Cooperman or no other official of Park & Tilford ever represented that Park & Tilford retained the right summarily to terminate. On the contrary, Cooperman when he informed Millett that its specific requests could not be granted also said that Park & Tilford would continue to sell Millett its products as long as they performed. Coupled with Cooperman's statements that Park & Tilford had no contract containing notice of termination provisions and the denial of the specific requests, this was not a *promise* that the con-

6. Ross v. Frank W. Dunne Co., 1953, 119 Cal.App.2d 690, 260 P.2d 104; El Rio Oils v. Pacific Coast Asphalt Co., 1949, 95 Cal.App.2d 186, 213 P.2d 1; Noble v. Reid-Avery Co., 1928, 89 Cal.App. 75, 264 P. 341.

7. See cases collected in 26 A.L.R.2d 1139.

8. Nissen v. Stovall-Wilcoxson Co., 1953, 120 Cal.App.2d 316, 261 P.2d 10.

tract's duration would be determined by the character of Millett's performance. All the persons in Millett's organization present during the negotiations understood this and so testified. But this statement and others made by Cooperman directed toward the continuing nature of the distributorship negatived any agreement that Park & Tilford could terminate at will.

Failing to show an *agreement* for termination at will, Park & Tilford argues that by *operation of law* a contract of this type of indefinite duration is likewise terminable at will.

They rely principally on Speegle v. Board of Fire Underwriters, 1946, 29 Cal.2d 34, 172 P.2d 867 and particularly on this language:

"A contract for permanent employment, however, is only a contract for an indefinite period terminable at the will of either party * * * unless it is based upon some consideration other than the services to be rendered." 29 Cal.2d 39, 172 P.2d 870.

The Speegle case and others involving indefinite employment contracts [9] are not controlling here. Speegle involved an insurance agent whose agency contracts with defendant underwriters were terminated by defendant. He wrote policies on these companies but bought nothing for resale.

The distributorship contract in the case at bar is more than a contract of employment or agency. It is also a contract of sale.[10] On the other hand, it is more than a mere sales contract. It partakes of the substantial aspects of both.[11]

At least one California case has applied the California rule pertaining to sales contracts of indefinite duration, i. e., that the party seeking to terminate must give the other party reasonable notice thereof and such termination cannot be effected until at least a reasonable time has expired,[12] to a contract in which plaintiff agreed to buy and exploit in California the warehouse receipts of defendant's distillery.[13] The distributorship contract viewed as a contract of sale would require this result here.

What of the contract's agency aspects? The California Courts hold that where a contract of employment or agency for an indefinite period is based on some consideration other than the services to be rendered it will continue for a reasonable period of time.[14] While there is some conflict regarding contracts for permanent employment based on such independent consideration it is clear that they likewise continue for at least a reasonable period of time.[15] The other consideration need not be unrelated to the services to be performed.[16]

9. See e. g. Ruinello v. Murray, 1951, 36 Cal.2d 687, 227 P.2d 251, and cases cited therein; compare Carpenter Paper Co. v. Kellogg, 1952, 114 Cal.App.2d 640, 251 P.2d 40.

10. Reitter v. Anderson, 1927, 87 Cal.App. 642, 262 P. 415.

11. See Kelly-Springfield Tire Co. v. Bobo, 9 Cir., 1925, 4 F.2d 71; Bendix Home Appliances v. Radio Accessories Co., 8 Cir., 1944, 129 F.2d 177; 4 Williston on Contracts, Rev.Ed. see 1027A.

12. Southern Pacific Co. v. Spring Valley Water Co., 1916, 173 Cal. 291, 159 P. 865, L.R.A.1917E, 680.

13. Great Western Distillery Products, Inc., v. John A. Wathen Distillery Co., 1937, 10 Cal.2d 442, 74 P.2d 745.

14. Brown v. National Electric Works, 1914, 168 Cal. 336, 143 P. 606; See— Thacker v. American Foundry, 1947, 78 Cal.App.2d 76, 177 P.2d 322; Carpenter Paper Co. v. Kellogg, 1952, 114 Cal.App. 2d 640, 251 P.2d 40.

15. Millsap v. National Funding Corp., 1943, 57 Cal.App.2d 772, 135 P.2d 407; Seifert v. Arnold Brothers, 1934, 138 Cal.App. 324, 31 P.2d 1059; Fibreboard Products, Inc. v. Townsend, 9 Cir., 1953, 202 F.2d 180.

16. Brown v. National Electric Works, supra note 14 (buying stock in employer's business); Gregg v. McDonald, 1925, 73 Cal.App. 748, 239 P. 373, (agreeing to purchase a share in the business which employee would manage); Millsap v. National Funding Corp., supra note

The requirement is that the consideration be *other than the service to be rendered as an employee or agent.*

The agency aspects of the distributorship contract required Millett to use its corporate best efforts to promote the sale of Park & Tilford products and to sell such products to the retail market. But in addition Millett agreed to and did buy Park & Tilford products, took title to them and thus assumed the risk of their destruction, maintained warehouse facilities and tied up a substantial amount of its capital in inventory and accounts receivable. While these functions are related to the services to be rendered they are not the aspects of the distributorship contract which are properly called agency. Factually, the agreement was an integrated whole. But for purposes of determining the applicability of the Speegle case the agency character of the relationship must be separated from its sales character. In my opinion the non-agency undertakings are sufficient additional consideration.

■ I conclude that the distributorship contract indefinite as to time could be terminated by either party only after a reasonable time [17] by giving prior reasonable notice.

■ Weighing the substantial outlay of money by Millett in taking on the distributorship and the difficulty in getting a distributorship started against the large economic stake Park & Tilford had in giving over the distribution of its products, I find from all the facts that one year is the reasonable period of time before which termination could not be effected. Bearing in mind the average inventory maintained by Millett and the average depletion of that inventory as well as the other facts, I find that three months is a reasonable period of notice. Thus the distributorship could be terminated at the end of one year by three months' previous notice or after such notice at any subsequent time.

■ Park & Tilford argues that the contract is void for lack of mutuality; that there was no obligation on the part of Millett to do anything. Mutuality is a legal term of elusive meaning, but as it relates to the validity of contracts in California, lack of mutuality means only lack of consideration.[18] It is conceded that where one party's promised performance depends upon that party's wish, will or desire [19] or where one party is free to perform or withdraw at its unrestricted pleasure [20] the promise of that party is illusory and is not sufficient consideration for the other party's promise, or, if you will, the contract is void for lack of mutuality.

But here, Millett promised to use its best efforts to further the sale of Park & Tilford products, to buy from Park & Tilford a sufficient quantity of its prod-

15; Stone v. Burke, 1952, 110 Cal.App. 2d 748, 244 P.2d 51 (giving up other employment—if this is communicated to the new employer: Thacker v. American Foundry, 1947, 78 Cal.App.2d 76, 177 P.2d 322); Fibreboard Products, Inc., v. Townsend, supra, (moving employee's family for a considerable distance and taking an inferior job while waiting for promised employment).

17. Compare 4 Williston on Contracts, Rev. Ed., sec. 1027A (3).

18. Stone v. Burke, 1952, 110 Cal.App.2d 748, 244 P.2d 51; Arrow Flying Service, Inc., v. Universal Flyers Ground School, 1950, 99 Cal.App.2d 49, 221 P.2d 231; Brawley v. Crosby Research Foundation, Inc., 1946, 73 Cal.App.2d 103, 166 P.2d 392.

19. California Refining Co. v. Producers Refining Corp., 1938, 25 Cal.App.2d 104, 76 P.2d 553; See—Ross v. Frank W. Dunne Co., 1953, 119 Cal.App.2d 690, 697, 698, 260 P.2d 104, 107, 108; Patty v. Berryman, 1949, 95 Cal.App.2d 159, 167, 212 P.2d 937, 942.

20. Fabbro v. Dardi & Co., 1949, 93 Cal. App.2d 247, 209 P.2d 91; Cox v. Hollywood Film Enterprises, 1952, 109 Cal. App.2d 320, 240 P.2d 713; Charles Brown & Sons v. White Lunch Co., 1st Dist. 1928, 92 Cal.App. 457, 268 P. 490; See—Naify v. Pacific Indemnity Co., 1938, 11 Cal.2d 5, 76 P.2d 663, 115 A.L.R. 476.

ucts to meet the demands of this market and to maintain an inventory, warehousing facilities and sales organization sufficient to do this. Such promises by Millett are sufficient consideration for Park & Tilford's promise to sell.[21]

Park & Tilford further argues that this contract is unenforceable under the California Statute of Frauds as a contract which by its terms was not to be performed within one year of the making thereof.[22]

It is the well established rule in California that if by its terms, performance of the contract is possible within one year, the contract does not fall within the statute even though it is probable that it will extend beyond one year.[23]

Although the ultimate duration of the contract was uncertain, the finding that the reasonable time required before termination is one year, compels viewing the contract as one in which performance cannot be completed within one year [24] except on the contingency that either party exercised its right to terminate on notice at the earliest possible moment. The effect of the right so to terminate is thus determinative. Williston on Contracts states at Section 498:

"The distinction between an excuse for not performing and completion of performance is taken in contracts requiring for their performance a period exceeding one year but which are subject to a right of defeasance not by operation of law but by the express terms of the contract within the period of a year * * *. Such contracts are generally held within the statute."

But this is not the California law. This Circuit applying California law in Hopper v. Lennen & Mitchell, 9 Cir., 1944, 146 F.2d 364, 161 A.L.R. 282 held that a contract which ran for five years but which was subject to termination by one party on four weeks' notice at intervals of twenty-six weeks was not within the statute.[25] But Millett's distributorship was not of fixed, but rather indefinite duration. In my opinion there is no material distinction. The ultimate effect is the same. As far as performance within one year is concerned it is of no importance whether performance in the event the contract was not terminated would continue for one month, five years or for an indefinite period. "The reason for the statutory rule is preserved, for at no time [is either party] bound for a period greater than the prescribed limitation for oral contracts."[26] I hold that the contract is not unenforceable under the Statute of Frauds.

Park & Tilford says that it had sound business reasons for terminating the re-

21. Long Beach Drug Co. v. United Drug Co., 1939, 13 Cal.2d 158, 88 P.2d 698, 89 P.2d 386; Ross v. Frank W. Dunne Co., 1953, 119 Cal.App.2d 690, 260 P.2d 104; Noble v. Reid-Avery Co., 1928, 89 Cal. App. 75, 264 P. 341; See—Kelly-Springfield Tire Co. v. Bobo, 9 Cir., 1925, 4 F.2d 71; Great Western Distillery Co., v. John A. Wathen Distillery Co., 1937, 10 Cal.2d 442, 74 P.2d 745; Ravel v. Hubbard, 1952, 112 Cal.App.2d 255, 246 P.2d 88.

22. California Civil Code, § 1624(1); California Code of Civil Procedure, § 1973 (1).

23. McKeany v. Black, 1897, 117 Cal. 587, 49 P. 710; Stewart v. Smith, 1907, 6 Cal.App. 152, 91 P. 667; Hellings v. Wright, 1916, 29 Cal.App. 649, 156 P. 365; Mayborne v. Citizens' Trust & Savings Bank, 1920, 46 Cal.App. 178, 188 P. 1034; Kressly v. District Bond Co., 1934, 138 Cal.App. 565, 32 P.2d 1112; Banta v. Rosasco, 1936, 12 Cal.App.2d 420, 55 P.2d 601.

24. See—Fibreboard Products, Inc., v. Townsend, 9 Cir., 1953, 202 F.2d 180.

25. Accord—Dutton Dredge Co. v. United States Fidelity & Guaranty Co., 1934, 136 Cal.App. 574, 29 P.2d 316. The Hopper case was cited with approval in El Rio Oils v. Pacific Coast Asphalt Co., 1949, 95 Cal.App.2d 186, 194, 213 P.2d 1.

26. Hopper v. Lennen & Mitchell, 146 F.2d at page 368.

lationship. These reasons would not be a defense unless they are founded in a failure by Millett to perform a substantial part of the agreed exchange for Park & Tilford's promise to sell.[27] I find that Millett substantially performed. There was no agreement regarding the volume to be sold, the precise number of salesmen or that primary emphasis would be placed on package stores. Millett promised to devote its best efforts to sell Park & Tilford products. This it did. The loss of Fred Pfeiffer, Manager of the Oakland Branch was not a condition to Park & Tilford's performance. The new manager performed well. The effect on other distributors of the close relationship between Millett and the Sherry Stores is not a breach by Millett since Park & Tilford requested the sale to these stores in the negotiations. In fact, Cooperman went to some pains to insure it. Juillard's dissatisfaction existed while the negotiations were going on and the distributorship began in spite of it. Even though Millett sold to military establishments at only $1.00 over the wholesale price, this was common in the industry and no contrary arrangement was reached. When these sales were called to Millett's attention they conformed to Park & Tilford's request. There was no breach of condition. Park & Tilford's repudiation of the agreement was a substantial breach of the contract and Millett is entitled to damages.

 Millett is also entitled to recovery on the third cause of action. Cooperman made representations that Park & Tilford had never in the history of that Company "cut off a distributor". This statement was false. The question of continuity permeated the negotia-

tions and was of primary importance to Millett. The representations were material and were relied upon to Millett's detriment.

There are three problems which merit some discussion—whether the statements of Cooperman though false were under California law fraudulent; whether Park & Tilford can be held liable for Cooperman's representations if they were fraudulent; and whether Millett's reliance on those statements was reasonable.

California by Statute has liberalized the common law requirements of *scienter*. California Civil Code, § 1572 defines actual fraud in material part as follows: "Actual fraud * *. * consists in any of the following acts, committed by a party to the contract * * with intent to deceive another party thereto, or to induce him to enter into the contract. (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true * * * "

 Cooperman's belief in the truth or falsity of his representations is not then critical since they were made in a manner not warranted by his information. They were positively and repeatedly made with the intent to induce Millett to enter into the distributorship. This constitutes actual fraud under California law.[28]

 Park & Tilford would be liable for Cooperman's fraud only if he was acting within the scope of his employment. In a very real sense Cooperman's authority did not extend to mak-

27. Bliss v. California Co-op. Producers, 1947, 30 Cal.2d 240, 181 P.2d 369, 170 A.L.R. 1009; Rakow v. The Innes Co., 1950, 96 Cal.App.2d 278, 215 P.2d 111; California Civil Code, § 1689(2) (3); See—Restatement of Contracts, sec. 274.

28. Curtis v. Title Guarantee & Trust Co., 1934, 3 Cal.App.2d 612, 40 P.2d 562, 42 P.2d 323; Rowland v. Columbia Mining, Water and Power Co., 1934, 2 Cal.App.2d 410, 38 P.2d 418; Lombardi v. Sinanides, 1925, 71 Cal.App. 272, 235 P. 455; Salomons v. Lumsden, 1949, 95 Cal.App.2d Supp. 924, 925, 213 P.2d 132. The intent to induce the other party to enter the contract is necessary. Harris v. Miller, 1928, 196 Cal. 8, 235 P. 981.

ing the fraudulent statements but that is not required. The question is whether the statements were made in relation to the subject matter or business dealing in which the agent had authority.[29] The principal is liable for placing his agent in a position which enables the agent while apparently acting within the scope of his authority to commit a fraud.[30] Here Cooperman's authority as Western Sales Manager, extended to negotiating with and obtaining distributors for the Company. Even though he had no final authority in their ultimate selection, obtaining the distributor's consent to take on Park & Tilford's products was clearly within his authority. Millett reasonably so understood it. The representations went to the heart of this function. Park & Tilford is liable.

■ I find that Millett's reliance was reasonable. There exists no duty in California to make an independent investigation into the truth of the representations [31] unless they are made under suspicious circumstances.[32] There were none here. Indeed one of the examples cited by Cooperman, the retaining of Tonklin and Modlin, was manifestly true. There is no evidence that any one in the Millett organization knew the representations were false.

■ This brings us to the fourth cause of action. The facts do not entitle plaintiff to any relief. The breach of contract without more would not give rise to an injunction.[33] I find as a fact there was no agreement between Thanos and Park & Tilford to eliminate Millett as a distributor. Nor was there any purpose in terminating the distributorship to appropriate Millett's custom and good will. Park & Tilford simply breached the agreement and stopped selling to Millett. Buxbom v. Smith, 1944, 23 Cal.2d 535, 145 P.2d 305 is not in point. Park & Tilford did not use the breach of contract to deprive Millett of its employees or organization.

There was no confidential relationship between Millett and Park & Tilford. The identity of customers—the retail outlets, are published to the trade and easily ascertainable. The solicitation of the business of these outlets after the termination of the distributorships is not unlawful [34] and does not constitute an enjoinable usurpation of confidential information and trade secrets.[35] Millett was likewise free to solicit its own customers. Park & Tilford's action does not amount to a boycott or effective restraint of trade.[36]

I find no agreement between Park & Tilford and Juillard to impose upon Millett prices or discounts. Under the contract Park & Tilford set the prices at which its products were to be sold to the retailers. In the absence of such an agreement, a refusal on the part of Park

29. Rutherford v. Rideout Bank, 1938, 11 Cal.2d 479, 80 P.2d 978, 117 A.L.R. 383; Grigsby v. Hagler, 1938, 25 Cal.App.2d 714, 78 P.2d 444.

30. Restatement of Agency, sec. 261. This section is the law in California. Speck v. Wylie, 1934, 1 Cal.2d 625, 36 P.2d 618, 95 A.L.R. 760; Ghiglione v. American Trust Co., 1942, 49 Cal.App.2d 633, 122 P.2d 301, and cases cited therein.

31. Hobart v. Hobart Estate Co., 1945, 26 Cal.2d 412, 159 P.2d 958; Bank of America Nat. Trust & Savings Ass'n v. Greenbach, 1950, 98 Cal.App.2d 220, 219 P.2d 814; West v. Great Western Power Co., 1940, 36 Cal.App.2d 403, 97 P.2d 1014.

32. Bank of America Nat. Trust & Sav-

ings Ass'n v. Greenbach, supra; Lobdell v. Miller, 1952, 114 Cal.App.2d 328, 250 P.2d 357.

33. Long Beach Drug Co. v. United Drug Co., 1939, 13 Cal.2d 158, 88 P.2d 698, 89 P.2d 386.

34. Order No. 129–A of California State Liquor Administrator, June 10, 1940; Aetna Building Maintenance Co., Inc., v. West, 1952, 39 Cal.2d 198, 246 P.2d 11.

35. Continental Car-Na-Var Corporation v. Moseley, 1944, 24 Cal.2d 104, 148 P.2d 9; Avocado Sales Co. v. Wyse, 1932, 122 Cal.App. 627, 10 P.2d 485.

36. Nelson Radio & Supply Co. v. Motorola, Inc., 5 Cir., 1952, 200 F.2d 911, certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356.

& Tilford to sell was not unlawful.[37]

Nor is the allowance of cash discounts, buy backs or the supplying of Park & Tilford products to its new distributors to the exclusion of Millett actionable. They are incidents of the distributorship and Millett's right to them ended when the contract was terminated. Millett's remedy is on the contract.

Defendant's motion for summary judgment is denied.

Findings of fact and conclusions of law will be prepared in accordance with the rule.

See, also, D.C., 117 F.Supp. 355.

---

37. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Nelson Radio & Supply Co. v. Motorola, Inc., supra.