P. P. WILLIAMS COMPANY, Appellant,

v.

COLORADO MILLING AND ELEVATOR COMPANY, Appellee.

No. 16491.

United States Court of Appeals
Fifth Circuit.

June 20, 1957.

Billy H. Quin, Brunini, Everett, Grantham & Quin, Vicksburg, Miss., for P. P. Williams Co., appellant.

Donald S. Stubbs, Denver, Colo., R. L. Dent, Burkett H. Martin, Dent, Ward & Martin, Vicksburg, Miss., Lewis, Grant & Davis, Denver, Colo., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment of the district court, sitting without a jury, dismissing defendant-appellant's counterclaim as not supportable by the evidence presented at the trial. The primary issue is whether the trial court erred in determining that the cancellation with little over a week's notice of a long-standing, largely unwritten, exclusive distributorship agreement was, under all the circumstances, not improper and did not result in determinable and recoverable damages. The principal facts are mostly undisputed and are here for the most part taken from the lengthy findings of fact of the court below.

The Colorado Milling and Elevator Company (hereinafter Colorado), the plaintiff-appellee, had over the past 40-50 years sold its "Pikes Peak" brand flour to the P. P. Williams Company (Williams) wholesale grocery firm, under an agency agreement whereby Colorado agreed not to sell that brand of its flour to any other wholesaler within Williams' designated sales territory. Though Williams also sold other brands of flour, some of it blended in its own plant, Pikes Peak was its largest seller. It was the only brand mentioned on its stationery and advertised on its trucks, and considerable money was spent by both Williams and Colorado in creating a demand for the flour in Williams' trade territory. Several times a year salesmen employed by Colorado would do "resale" work in Williams' territory by accompanying the Williams salesmen on their weekly rounds to the retail grocers to help promote the sale of Pikes Peak. When prior to 1947 the sales of this flour slumped badly the parties agreed on a large scale joint selling and advertising campaign and Williams also agreed that it would push Pikes Peak as its leading brand, even in preference to its own blend, "Mountain Peak"; as a result of this effort the sales of Pikes Peak by Williams reached their highest levels.

Prior to 1951 Williams was locally owned by several residents of Vicksburg, Mississippi, but in that year all of its shares were purchased by the Russell Company of Mississippi, a large wholesale grocery distributor; the management of Williams was thereupon changed. Colorado became very much concerned about the possibility that the Russell management would, as a matter of policy, promote one of its own brands of flour in preference to Pikes Peak. It was testified that when the Russell Company had earlier taken over another local grocery wholesaler who had purchased a brand flour from Colorado, they

stopped selling this brand to their retailers so that soon it lost its trade acceptance and Colorado had not been able to reinstate it since; similarly Colorado knew that upon the change in ownership of Williams the company discontinued its purchases of a brand flour from another milling company.

This apprehension by the management of Colorado was communicated to some of the officers of Williams soon after the change in management, and the latter promised to continue to promote the Pikes Peak brand. However, during the following two years Williams' sales of Pikes Peak decreased 43%, while its sales of its own brands increased 16%, and its sales of other small brands decreased 51%;[1] thus though Pikes Peak kept accounting for nearly half the sales, its percentage position was being maintained in the face of the fall in volume only through the still more rapid drop in the sales of the other mill brands. On several occasions officials of Colorado indicated their concern or dissatisfaction to Williams, though no direct ultimatum was ever issued.

On May 16, 1953, representatives of Colorado were attending a convention of retail grocers and there discussed among themselves the advisability of terminating the relationship with Williams. They consulted a representative of the Goyer company, one of Williams' largest competitors, who already was handling several other brands of Colorado flour, and he agreed to take over the Pikes Peak account in about two-thirds of Williams' former territory. The next day unsuccessful efforts were made by Colorado to place the other one-third of the business. On Thursday, May 21st, a letter was sent to Williams stating that after a long and careful study of the facts and circumstances Colorado had decided to terminate its relationship with Williams as of June 1st.

This letter was received on Saturday, May 23rd, after the weekly meeting of the Williams salesmen had already terminated. On Monday, while officials of Williams were still attempting to reach Colorado to discuss this decision with them, the Williams salesmen left on their weekly rounds to the retail grocers in their area and no effort was made by Williams to contact them directly before the next weekly meeting once the finality of the Colorado decision was ascertained, nor was any effort made to contact the retail grocers directly; during the first week of June the Williams salesmen finally carried the news to the customers. However, on June 1st several Goyer salesmen, each accompanied by a representative of Colorado, went to visit Williams' customers of Pikes Peak, a list of whom had been obtained by Colorado from its salesmen who had previously made the "resale" rounds with the Williams salesmen; in some instances these teams reached the grocers before the Williams salesmen could do so. It is not contended that any statements made by the Goyer and Colorado men to the grocers were either unfair or untrue, but appellant does complain of the detrimental effect of the suddenness of the change, of the fact that no joint explanatory announcement by Colorado and Williams was made and of the fact that the first news of the change came to many customers first from the Goyer-Colorado teams.

Colorado brought suit against Williams to recover the value of the last flour shipment that had been delivered, which Williams had refused to pay for or to return, in spite of Colorado's offer to accept it. Appellant counterclaimed for damages arising out of the alleged conspiracy with Goyer to injure its business.

---

1. The record shows the following sales during the indicated June 1 to May 31 crop years:

| | Pikes Peak | Williams' own brands (in hundredweights) | Other mill brands |
|---|---|---|---|
| 1950–51 | 27,272 | 9,688 | 18,283 |
| 1951–52 | 21,061 | 10,851 | 15,612 |
| 1952–53 | 15,624 | 11,248 | 8,959 |

The trial court granted summary judgment to Colorado on the original complaint, and, after a trial without a jury, dismissed the counterclaim. The court concluded that though by the law of most states an agency contract such as this would fail as to any unexecuted portion for want of mutuality of obligation, the Mississippi law, as it appears in Westbrook v. McCarty, 160 Miss. 455, 134 So. 193, seems to require reasonable notice from either party before an arrangement such as this can be terminated; however, it found that the notice here given was under all the circumstances reasonably timed, and that in any case appellant had not proven with any certainty the damages resulting from appellee's alleged improper behavior. This appeal involves only the disposition of the counterclaim.

Appellant attacks both the conclusions of the trial court that the notice given was adequate and that the proof of damages was too indefinite. It is asserted that the notice was calculated not to give Williams sufficient time to inform its customers in the normal course of business of the loss of the Pikes Peak account, since by the time the notice was received the salesmen had already left on their rounds for the last full week before the effective date of the termination; thus Williams was left with the several unsatisfactory alternatives of communicating this very unsettling news to the salesmen by phone or letter, of magnifying the setback by immediately recalling their salesmen for a conference or by writing their customers directly, or of waiting to inform the salesmen at the end of the week and thus being anticipated by the Goyer salesmen in contacting many of their customers. No time was allowed to Williams to arrange for the acquisition of another distributorship so that it could offer another leading mill brand to its customers, or to permit the termination of the advertising of Pikes Peak on the Williams stationery and trucks. It is further contended that it is clear that considerable damages were suffered by Williams as a direct consequence of appellee's wrongdoing, and thus appellant is entitled to recover some damages even if their exact amount is in the nature of the case not ascertainable. Finally, appellant contends that aside from the insufficient notice appellee was also guilty of improper conduct in accepting an order for Pikes Peak from Goyer even before the June 1st termination of Williams' exclusive dealership, and in making available to Goyer the list of Williams' customers of Pikes Peak flour, which information had been obtained in confidence when Williams permitted the Colorado salesmen to accompany their men on their weekly rounds.

Appellee of course supports the findings and conclusions of the trial court, but it asserts that the court was mistaken in concluding that Mississippi law differs from that prevailing in most American jurisdictions in requiring a reasonable termination notice for an arrangement such as this.

Considering first the point raised by appellee, which, if valid, disposes of almost all issues in the case, we note that the trial court found that there was no valid contract between the parties fixing the length of time their relationship would continue. It found, and it could not have done otherwise from the evidence, that Williams was in a position to terminate the relationship at any time by merely declining to order any more flour, and that as a matter of fact its purchases had declined drastically during the past two years. It concluded that the relationship was one terminable at will, for which, "under many authorities," no notice is required, but that under the law of Mississippi, as expressed in the case of Westbrook v. McCarty, supra, "where the relationship is as here" a reasonable notice of termination is required.

A study of the cited case convinces us that appellee is correct in suggesting that Mississippi law is no different on this point than that of the majority of other jurisdictions. There part of a contract, which also involved considerable other subject matter, required that plaintiff manufacture for defendant certain fix-

244

tures alleged to be of no value to anyone except defendant, with prices, approximate quantities, and other terms set forth in flexible language; the defendant was accused of having placed its order for these fixtures with other suppliers and the issue was whether an otherwise binding agreement which by its express terms did not provide for any time or mode of termination could be unilaterally called off by one party. The Mississippi Supreme Court said that it could be since the interpretation of contracts as perpetual was not favored, and, citing Corpus Juris [2] and an earlier Mississippi case [3] stated that such contracts were terminable by either party on reasonable notice. But the issue of the requirement of mutuality of obligation for such a supply contract was not raised because the court evidently concluded that in that case both parties were bound by at least some of the promises in the contract, nor was reasonable notice at issue, since, as the court observed, the appeal was on the pleadings and reasonable notice was presumed. It is thus clear that the Mississippi Supreme Court was not attempting to establish a rule different from that which it believed to prevail generally (as indicated by the reliance on Corpus Juris) and also that its reference to the reasonable notice requirement was mere dicta and in any case in no way applicable to this case. The "Mississippi Rule" contended for by appellant does not exist.[4]

The "contract" here in question is of course entirely different. Even assuming that the agreement contended for actually exists, as to which the trial court made no explicit finding and the pleadings merely alleged that it is a contract appellee had assumed upon acquiring a certain mill many years ago with which Williams had an agreement and which had been confirmed by many years of practice, the only obligation it placed on anyone is that Colorado was not to sell Pikes Peak to any other wholesaler within a designated territory. There is no obligation on the part of Williams to purchase any particular or minimum quantities, to pay any set price, to refrain from selling any other flour, or even to refrain from pushing such other brands. Actually the relationship can more accurately be characterized as an "arrangement" under which the parties made a series of ad hoc contracts or agreements from time to time; purchases of flour as and when ordered by Williams, at prices presumably set by Colorado; mutually or unilaterally financed advertising campaigns; and, as a matter of mutual benefit, but not as a matter of obligation, promises by Colorado not to sell to competitors and on the part of Williams to press Pikes Peak above all other brands. Such sales agency relationships, even if considerably more formalized, are generally, as the trial court stated, subject to unilateral cancellation without notice since they are not actually mutually binding contracts,[5] and we find nothing in

2. 13 C.J., Contracts § 630, at page 605; 17 C.J.S., Contracts § 398.

3. Echols v. New Orleans J. & G. N. R. Co., 52 Miss. 610.

4. The earlier Echols case, supra, also contains nothing suggesting a unique Mississippi position, and, as later pointed out in Rape v. Mobile and Ohio R. Co., 136 Miss. 38, 100 So. 585, 35 A.L.R. 1422, even the apparent holding that an indeterminate supply contract should at least be enforceable for a minimum term is not a holding of the Supreme Court but was merely assented to by the party that might have complained.

5. See e. g., Meredith v. John Deere Plow Co., 8 Cir., 185 F.2d 481; Terre Haute Brewing Co. v. Dugan, 8 Cir., 102 F.2d 425; Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167; E. I. Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F. 2d 224, 89 A.L.R. 238; Curtis Candy Co. v. Silberman, 6 Cir., 45 F.2d 451; Miami Coca-Cola Bottling Co. v. Orange Crush Co., 5 Cir., 296 F. 693. In the cases principally relied on by appellant, Sargent v. Drew-English, Inc., 12 Wash.2d 320, 121 P.2d 373, and J. C. Millett Co. v. Park & Tilford Distillers Corp., D.C.N.D. Cal., 123 F.Supp. 484, it is clear that the distributor undertook certain obligations,

the Mississippi law to the contrary. Nor did the trial court find any particular obligations definitely assumed by appellant, or "instinct" in the arrangement,[6] which might sustain the validity of the contract.

■ Although this conclusion that no termination notice at all was required by Mississippi law makes it unnecessary for us to consider appellant's complaint that the trial court erred in finding the notice of little over a week reasonable, we would like to note that we find no error in that determination. As the trial court observed, the notice given was sufficient to permit Williams to inform its customers before the visits of the Goyer salesmen starting on the first of June. Appellant's complaint that this could not be accomplished in the usual manner since the salesmen had already left for their territory by the time that appellant's officers had assured themselves through phone calls to appellee that the account was indeed lost, carries no great weight, since plainly a change of such importance could not be accomplished with perfect smoothness and to everyone's full satisfaction. That appellant chose first to check the news through two days of phone calls to Colorado and then decided not to recall their salesmen in order not to disrupt their normal selling schedule were decisions that appellant was free to make and of whose consequences it can not complain. The trial court was also correct in taking account of the fact that this was not the only line of flour handled by appellant and of the fact that for some time it appeared that it was more interested in pushing its own brands. Similarly, proper account was taken of the trial court's determination, supported by the evidence and not "clearly erroneous," that appellee was acting in good faith, out of a desire to protect its own valuable brand, and that it could reasonably fear that if a longer adjustment period were allowed Williams would now positively attempt to destroy the Pikes Peak market in its territory, a project that had been 43% accomplished during two years of merely unenthusiastic selling. The decision of the district court in J. C. Millett Co. v. Park & Tilford Distillers Corp., D.C.N.D.Cal., 123 F. Supp. 484, heavily relied on by appellant, rests on its own particular, distinguishable facts, and on California law, and does not control us.

■ Again the above determination makes it unnecessary to consider the trial court's alternative ground for its dismissal of the counterclaim; that damages due to the termination were not proven with sufficient certainty. However, in the face of appellant's vigorous protests as to this determination we note that the trial court's position is even stronger than it itself stated, for since even appellant does not insist that the termination itself was wrongful, the issue is whether appellant proved with any certainty damages due solely to the abbreviated notice. All of appellant's evidence as to loss of total flour sales during the subsequent period, especially as based in part on an assumed continuation on a then prevailing short-term rising trend of sales, are thus meaningless—even if there had not been alternative extraneous factors, mentioned by the trial court, that might have accounted for the decline in sales. Assuming, on the basis of appellant's most anguished argument, that it had a legal right to insist on a notice period long enough to obtain the distributorship of a substitute brand and to inform its sales force of the switch at least a week before Goyer entered the field, there is no showing of any loss attributable to the notice shortened beyond that period; appellant plainly could not have used a longer period, before its "obligation" under the "contract" actual-

---

either to refrain from selling competing products or to take and stock quantities of the merchandise—while in the present case the trial court found no such obligations assumed by the appellant; only the case of Abrams v. George E. Keith Co., 3 Cir., 30 F.2d 90, which it-

self cites no authorities, appears clearly to support appellant's position.

**6.** Cf. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214; Bach v. Friden Calculating Machine Co., 6 Cir., 155 F.2d 361.

ly ceased, to switch their customers to an alternative brand of flour.

 We come now to appellant's final, alternative claim, that Colorado acted improperly in supplying the names of Williams' customers of Pikes Peak to Goyer on the day on which the new distributorship became effective. The cases cited by appellant can rather easily be distinguished. In Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101, the court, unlike here, found that a valid, subsisting distributorship contract had been breached months before it could legally be terminated, and that as part of the conspiracy to breach the new distributor had hired the former distributor's entire sales force. In Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237, 245, it was held improper for the employees of an agency who agreed to leave their employer and to form a new agency to contact their employer's customers and to solicit them for the new company "*during* the period they were completing their duties as employees of plaintiff." (Emphasis added; here there is no contention that Williams' customers were contacted before its exclusive distributorship ended on May 31st.) Even in Barnes v. Cahill, 56 Cal.App.2d 780, 133 P.2d 433, whose here pertinent facts more closely approximate those in this case, it is to be noted that the confidential information about plaintiff's customers was obtained by defendant at a time when he had no independent interest in these names and incidental to his bookkeeping activities for plaintiff. Here, however, Colorado obtained these names from its own files, as a result of the resale work done by its own salesmen, whose trips with the Williams force were not alleged to have been for any covert purpose. Colorado was legitimately interested in these contacts from the beginning, as these were the retail distributors of its own flour, on whose selling efforts the success of the product would ultimately depend. In a sense these grocers were customers of Colorado as much as they were of Williams.[7]

With the end of the relationship between Colorado and Williams, it appears to us that both appellant and appellee had a legitimate interest in the trade of these retailers. Colorado could approach them, through its new distributor, to ask them to continue with Pikes Peak, while Williams could offer to them a new brand of flour to be obtained through their old wholesaler. We do not see that in this particular case either party had such a pre-eminent interest in the relationship with the retail grocers that it could complain of the other party's legitimate approach to them.

The judgment of the trial court is Affirmed.

---

7. Appellant refers us to a statement by one of appellee's officers at the trial to show that Colorado conceded that these were really Williams' customers. It appears to us that in context the reference to "P. P. Williams Customers" was merely to identify with which wholesaler they were associated.