**SMOKY MOUNTAINS BEVERAGE COMPANY, Plaintiff,**

v.

**ANHEUSER–BUSCH, INCORPORATED, Defendant.**

Civ. A. No. 3861.

United States District Court
E. D. Tennessee, N. D.

March 29, 1960.

J. H. Hodges, Knoxville, Tenn., Williams, Harwell, Howser & Thomas, Nashville, Tenn., James Henry, Tullahoma, Tenn., for plaintiff.

John Hayward, St. Louis, Mo., Frantz, McConnell & Seymour, Knoxville, Tenn., for defendant.

TAYLOR, District Judge.

This is a suit by Smoky Mountains Beverage Company, plaintiff, against Anheuser-Busch, Incorporated, defendant—and for brevity purposes the plaintiff will hereafter at times be referred to as Smoky Mountains and the defendant as Anheuser-Busch, and whenever and wherever Royal Crown Bottling Company is used it will be referred to as Royal Crown—to recover damages for breach of contract relating to a beer distributorship operation in the Knoxville area and for tortious actions of Anheuser-Busch that resulted in injury to Smoky Mountains.

Plaintiff is a corporation organized under the laws of Tennessee with its principal office in Knoxville, and the defendant is a corporation organized under the laws of Missouri with principal offices in St. Louis.

The Court has heard numerous witnesses testify in the case, all of whom appeared in person except Mr. August A. Busch, thus enabling the Court to see and hear at first hand the testimony of these witnesses who disagree in some respects with regard to the course of dealings between Smoky Mountains, represented by Mr. Charles M. Brown, and Anheuser-Busch, represented by Messrs. Wm. Bien, Lou Fogassey, S. I. Lewis, M. L. Belote, Robert H. Beasley, Glenn Niebur, and T. C. Burrows. Some 165 exhibits have been filed in the suit and, as indicated, the trial has lasted seven days.

The complaint consists of four distinct and separate counts. The first count charges an implied contract between the parties which arose in the course of dealings and conduct of the parties over a period of years and which Smoky Mountains asserts was breached.

The second count charges an express contract that was made in November 1957 at which time Anheuser-Busch required Smoky Mountains to undertake the sale and distribution of Budweiser and Michelob draught beers in the Knoxville territory, and expressly agreed that if Smoky Mountains would take on draught beer it would continue as Anheuser-Busch's exclusive agent in the Knoxville territory, and Smoky Mountains in reliance on that express promise expended large sums of money in advertising and promoting the sale of draught beer; that instead of carrying out its promise the defendant abruptly and in bad faith terminated Smoky Mountains' entire distributorship of beer as of November 1, 1958.

The third count charges a conspiracy between the representatives of Anheuser-Busch, particularly Messrs. Beasley, Lewis, Belote, Bien and Burrows and the present distributor of Anheuser-Busch products in the Knoxville territory, who is a Mr. E. L. Tipton and is the chief owner and operator of the Tipton Distributing Company in Knoxville. Smoky Mountains asserts that these conspirators committed overt acts in pursuance of the conspiracy which greatly injured it and ultimately resulted in the loss of its distributorship in Knoxville.

The fourth and last count charges that Anheuser-Busch representatives in the furtherance of Anheuser-Busch's business intentionally and by deceit perpetrated a fraud upon Smoky Mountains by deceiving its president and representative, Mr. Brown, into believing that if Smoky Mountains installed the draught beer in its territory and put on additional trucks and increased its routes and increased its personnel and advertising expenditures, that Smoky Mountains would be continued as An-

heuser-Busch's wholesale distributor and representative in Knoxville and the other fourteen adjacent counties for a least one year from the time the misrepresentations were made and an unnamed number of years that were to follow.

Anheuser-Busch denies that it had either an implied or express contract with Smoky Mountains. It says, in substance, that it sold its beer to Smoky Mountains upon an order-to-order basis, and that since it did not have any contract with Smoky Mountains it could not or did not either in law or in fact breach such alleged contract.

Anheuser-Busch denies that its representatives conspired with Tipton or anyone else to commit a legal wrong against Smoky Mountains. In that connection Anheuser-Busch says that its representatives, Mr. Beasley and the other individuals named, acted at all times in good faith and what they conceived to be the best interests of their company in dealing with Smoky Mountains' representative or representatives.

Anheuser-Busch denies that its representative Mr. Fogassey made a misrepresentation of fact to either Mr. Brown or Mr. Richard L. Carson in the November 1957 conference in St. Louis.

Anheuser-Busch denies that Smoky Mountains suffered any damages by reason of any alleged breach of contractual duty owed to Smoky Mountains or by reason of any tortious breach of duty owed to plaintiff.

A pre-trial conference was held in this case in which the attorneys for the respective parties participated, and on February 12, 1960 the pre-trial order was filed in which the issues for the determination of this Court were set forth as follows:

(1) Did a contractual relationship, express or implied, exist between plaintiff and defendant prior to November 1, 1958?

(2) If so, was such contract repudiated and breached by defendant?

(3) If such contract existed and was breached by defendant, was such breach brought about through the mala fides of defendant?

(4) Did the defendant conspire with others to cancel and repudiate its contract with plaintiff for the purpose of transferring plaintiff's wholesale distributorship to one or more of its conspirators with the intent of crippling and destroying plaintiff's said business and eliminating plaintiff as a business competitor?

(5) Did the defendant fraudulently mislead and deceive the plaintiff into making expenditures for the installation of draught beer in its territory, entice it to put on additional trucks and increase its routes, increase its supervisory and office personnel, and increase its advertising and promotional expenditures, and to make other extraordinary expenditures, all in the belief that plaintiff would be continued as defendant's representative, to the injury and damage of the plaintiff, or to the unjust enrichment and benefit of the defendant?

(6) If plaintiff had a contract either express or implied, is it unenforceable by reason of the Tennessee statute of frauds?

(7) If the contract, whether implied or whether express, was breached, what is the amount of damages that resulted to plaintiff as a proximate result of such breach?

(8) If defendant breached a duty owed to the plaintiff and thereby committed a tort against the plaintiff, what is the amount of damage to which plaintiff is entitled under the tort phase of the complaint? (Plaintiff will not be permitted to recover both under the contract and under the tort phase of the litigation but will only be entitled to recover, if at all, under either the contract theory or the tort theory.)

(9) Is the plaintiff entitled to punitive damages, if so, how much?

In order to better understand the issues, a brief recitation of the dealings between the parties to the suit and a short review of some of the pertinent testimony is proper.

At this point the observation should be made that it is difficult to give a brief review of the history of the dealings of the parties and the testimony in the record because, as previously indicated, the testimony is long and the exhibits numerous.

In 1936 Smoky Mountains' predecessor was the distributor for Anheuser-Busch in fifteen East Tennessee counties for the sale at wholesale of Anheuser-Busch's Budweiser beer. In 1938 Smoky Mountains' predecessor, Chero Cola Bottling Company, was organized into a company which has been referred to so many times in this record as Royal Crown Bottling Company and the distributorship of this beer was thereafter continued in the same territory theretofore covered by its predecessor.

In 1939 Royal Crown was handling other beers for other breweries than Anheuser-Busch, and at that time was not only a wholesale distributor for Budweiser beer, a premium beer, but was also wholesaler for another premium beer known as Kruger's Ale. It was also distributor for other brands of beer known as popular priced beers.

In 1939 Anheuser-Busch, through its representative, either demanded or suggested that Smoky Mountains' predecessor give up and discontinue its wholesale distributorship of the premium beer Kruger's Ale, a competitive brand of Anheuser-Busch's premium brand, Budweiser beer.

Mr. Charles M. Brown and his family own 425 shares out of a total of 500 shares of Smoky Mountains stock, and Smoky Mountains and Mr. Brown and his family own 4,500 shares out of a total of 5,000 shares of Royal Crown stock.

Smoky Mountains has sold Budweiser beer exclusively since 1949 and increased its facilities to handle this beer at the termination of World War II. Sales of the beer increased materially in 1948 due to increased facilities, according to Mr. Brown.

1953 was Smoky Mountains' biggest year in sales, which was due to a beer strike in Milwaukee where the beer of Smoky Mountains' chief competitor was made. In the year 1953 Smoky Mountains sold over 500,133 cases of beer. The sales dropped back from the peak sales of 1953 in the years 1954, 1955, 1956, 1957 and 1958, but in July 1958 they began to increase again.

Three thousand square feet of additional warehouse space was added to the facilities of Smoky Mountains in 1953. On January 1, 1954, a five-year lease from Royal Crown to Smoky Mountains for additional space was made.

In 1956 Smoky Mountains sold 27.27 per cent of all beer sold in Smoky Mountains' territory, according to Tennessee tax records, and 27.22 per cent of all beer sold in Smoky Mountains' territory in 1957 and the first ten months of 1958. In 1956 Smoky Mountains sold 30.75 per cent of all Anheuser-Busch products sold in Tennessee; in 1957, 29.57 per cent, and for the first ten months of 1958 24.39 per cent. During this period the average consumption of Budweiser beer in Tennessee was 9.95 bottles per capita, but in plaintiff's territory the average consumption of Budweiser beer was 17.94 bottles per person.

From 1952 through the first ten months of 1958 Smoky Mountains' average net profit was $20,377.20 per year. Smoky Mountains' sales suffered decreases from 1955 to 1957, which Mr. Brown attributes to a business recession and to Schlitz beer competition as well as tax increase on beer. The Tennessee tax records show that 42 per cent of all Budweiser and Michelob product that was sold by the four principal distributors in Tennessee during the years 1956 through 1958 was sold in Knoxville's territory.

Mr. Robert H. Beasley became the Knoxville territory manager for Anheuser-Busch in 1955, and at that time Mr. Lou Fogassey was regional sales manager.

In 1957 Messrs. Fogassey and Brown held a meeting here in Knoxville just

before Mr. Brown left for a Florida vacation which was to last for two weeks but because of a telephone call from Mr. Carson, Mr. Brown returned to Knoxville a week early. Mr. Carson advised him that he had learned that Mr. Fogassey had said to Mr. Beasley that Smoky Mountains was to lose the Anheuser-Busch account. Upon his return a meeting was held in which Messrs. Brown, Carson and Beasley participated. Mr. Carson stated to Mr. Beasley, in substance, that he had learned from reliable sources that Mr. Beasley had stated that Mr. Fogassey had stated that Smoky Mountains Budweiser account was to be changed. Mr. Beasley replied that Mr. Carson had misunderstood him; that Mr. Fogassey did not say that the account was to be changed but simply said that changes had to be made in Smoky Mountains' operation.

In the summer of 1957 Mr. Carson and Mr. Brown made a trip to St. Louis and conferred with Mr. Fogassey for two purposes, the first of which was to discuss the increase in the price of beer and the second to discuss what has been referred to so many times in this record as the KPA (key potential accounts) program and which proved to be a bone of contention between Mr. Brown on the one side and Messrs. Beasley, Lewis, Bien and other representatives of Anheuser-Busch on the other.

In November 1957 Mr. Beasley told Mr. Brown that Mr. Fogassey had ordered him to put in draught beer or else. Following this conversation Mr. Carson and Mr. Brown made a special trip to St. Louis where they conferred with Mr. Fogassey and discussed three specific questions.

The first, putting in draught beer; second, split accounts, and third, whether the Anheuser-Busch Budweiser account was to be changed. Mr. Fogassey told them at that time that the account was not to be changed. Mr. Brown acted upon this assurance and put in draught beer. Within eleven months thereafter the account was terminated.

There is a letter in the file which has been made a part of the record to the effect that Mr. Beasley wrote Mr. Lewis that he drove draught beer down Mr. Brown's throat.

Another meeting was held in Knoxville on July 11, 1958 which was attended by Messrs. Carson, Brown, Bill Tarver, Beasley, Lewis and Belote, and which has been referred to by Mr. Lewis and Mr. Beasley as a very important meeting.

In this meeting Mr. Lewis pointed out to Mr. Brown some things that should be done or must be done to improve the Knoxville beer market. These suggestions, or demands, were reduced to writing by Mr. Lewis in his letter to Mr. Brown under date of July 15, 1958.

Mr. Brown thought Mr. Beasley got mad with him in 1957 and he stated that Mr. Beasley was not in his office but six times during the following 18 months. Mr. Brown states that Mr. Beasley told him immediately following the July 1958 meeting that the account would not be changed.

Another meeting was held on September 26, 1958, which has also been described in the record by numerous witnesses as a very important meeting, in which Messrs. Brown, Lewis, Tarver, Beasley, Belote and Niebur attended, and at which Mr. Lewis told Mr. Brown, in substance, that Smoky Mountains had not carried out the suggestions made in the July 11, 1958 meeting and as set forth in his letter of July 15, 1958, and that Mr. Brown should write a letter voluntarily giving up the account, but Mr. Brown told him he would not do so.

Two or three days thereafter Mr. Lewis telephoned Mr. Brown and repeated this request.

The account was closed October 31, 1958.

Mr. Brown wrote Mr. August A. Busch, president of defendant, for an audience but never received a reply from Mr. Busch.

Mr. Brown conferred with Messrs. Bien and Lewis in New York around

October 14, 1958, at which time it is reasonable to infer that Mr. Bien made known to Mr. Brown that the distributorship would end as of October 31, 1958 although Mr. Burrows was to write the letter of termination. Mr. Brown received the terminating letter from Mr. Burrows on October 23, 1958, which was dated October 22nd. Mr. Brown states that since the termination he has tried to return to the beer business without success.

Mr. Bien gives as the reasons for terminating the distributorship: (1) inadequate management; (2) insufficient share of the market; (3) lack of public relations; (4) conversion of profits to Royal Crown; (5) making of promises to management of the brewery in the nature of an appeasement, and not in good faith executing the promises; (6) steady sales decline of Budweiser. Five persons reviewed the Smoky Mountains file before the account was changed.

Mr. Lewis came with Anheuser-Busch in January 1958 when he was made sales manager for the southern region. He took the position formerly held by Mr. Fogassey. In due time he made a survey of the Knoxville market and found it bad. He states that he explained to Mr. Brown about the survey which was made by him, Beasley and Belote immediately before the July 11, 1958 meeting and impressed upon him the seriousness of the meeting. He also stated that he made it known to Mr. Brown that he was discouraged over his failure to cooperate.

It is clear from his testimony and that of Mr. Beasley and Mr. Brown that these matters were discussed in detail in the July 11, 1958 meeting and that Mr. Lewis, as the representative of Anheuser-Busch, expected the suggestions made in that meeting to be carried out by Smoky Mountains to the end that the market in the Knoxville area could be improved insofar as Anheuser-Busch was concerned. The point was made that the distributor of Schlitz beer, a strong competitor of Anheuser-Busch and managed by Mr. Mike Gleason, was making much greater headway in the Knoxville market than

was Anheuser-Busch and that something drastic had to be done in order for Anheuser-Busch to reclaim the leadership in the Knoxville market.

Mr. Lewis caused to be made another survey of the Knoxville market preparatory to the September 26, 1958 meeting. This survey showed, according to Messrs. Lewis and Beasley and other representatives of Anheuser-Busch who were active in the Knoxville market, that the recommendations made by Mr. Lewis in the July 11, 1958 meeting were not carried out by Mr. Brown either in letter or in spirit. Mr. Lewis was very much upset over the findings from the survey and so advised Mr. Brown. Mr. Beasley and other representatives of Anheuser-Busch were also discouraged by the results shown by the survey. Because of this discouragement, as previously indicated, Mr. Lewis suggested to Mr. Brown that he voluntarily give up the distributorship.

██ Returning now to the issues, the first of which is: Did a contractual relationship, express or implied, exist between the plaintiff and defendant prior to November 1, 1958.

The answer is in the negative.

This record shows that Anheuser-Busch has about 930 wholesale distributorships throughout the United States and that it does not have any franchise agreement, license agreement, or other forms of contracts with any of these wholesale distributors. Anheuser-Busch's dealings with other wholesale distributors of beer would not control its dealings with Smoky Mountains and would not have any bearing on such dealings except insofar as such dealings may bear on the intent or good faith dealings with Smoky Mountains throughout the period that is involved.

This record further shows that as early as 1948 Anheuser-Busch wrote to Mr. Brown or forwarded other documentary evidence to him which contained language to the effect that Anheuser-Busch does not grant franchises, licenses or make contracts with its wholesale dis-

tributors but simply deals with them upon an order-to-order basis.

· The conclusion of the Court on this point is fortified by the dealings of Mr. Brown and Mr. Carson with Mr. Beasley, Mr. Belote, and other representatives of the defendant company as early as February 1957. At that time, reference to which heretofore has been made, Mr. Carson became alarmed because of information he received from Mr. Walker, an official of Smoky Mountains, to the effect that Mr. Beasley had stated in substance that Fogassey had stated when he came here to Knoxville during that month that the Smoky Mountains distributorship was to be terminated.

Mr. Carson became so disturbed over that rumor that he immediately telephoned Mr. Brown, who was on vacation and who, above all other times, would have the right to keep his mind off of business, the information which he had received from Mr. Walker. Mr. Brown became so upset that he cut short his vacation one week to get back to Knoxville in an effort to find out if there was any sound basis for the rumor.

If Mr. Brown had a contract with Anheuser-Busch for a reasonable period of time, is it reasonable to believe that he would become so upset over this mere rumor? If he had an enforceable contract that Anheuser-Busch could not cancel the distributorship, then whatever Mr. Fogassey may have said about cancelling out the distributorship was meaningless.

In November 1957 Mr. Carson and Mr. Brown made a trip to St. Louis, the principal purpose of which was to find out if these rumors allegedly coming from Mr. Beasley to the effect that Smoky Mountains' distributorship was to be cancelled were true. More will be said about that meeting in November later on in this memorandum.

If Smoky Mountains felt it had a contract which could not be terminated except upon reasonable notice and except for just cause, there was no reason for Mr. Carson, an able lawyer, and Mr. Brown being so disturbed about these rumors and having Mr. Fogassey to go

on record that the rumors were groundless.

The relationship between Smoky Mountains and Anheuser-Busch was in the nature of a distributorship for the sale of beer in fifteen East Tennessee counties, which was in the nature of an exclusive sales agency or a buyer-purchaser relationship or combination of both subject to termination at the will of either party with or without cause. Curtiss Candy Company v. Silberman, 6 Cir., 45 F.2d 451; Terre Haute Brewing Company v. Dugan, 8 Cir., 102 F.2d 425, 427; P. P. Williams Co. v. Colorado Milling & Elevator Co., 5 Cir., 246 F.2d 240, 244. See also Jack's Cookie Company v. Brooks, 4 Cir., 227 F.2d 935, 938; Savage v. Spur Distributing Co., 33 Tenn.App. 27, 30, 228 S.W.2d 122; Williston on Contracts—Revised Edition, Vol. 4, pp. 2854-5, Note 18; Flint v. Youngstown Sheet & Tube Co., 2 Cir., 143 F.2d 923, 925; and 89 A.L.R. p. 258, Note 3(a).

There is a line of cases holding that where there is an agreement between parties for an indefinite time that if either party undertakes to cancel the arrangement he or it must give reasonable notice to the other. The decision of the late Judge Murphy, District Court, 9th Circuit, in the case of J. C. Millett Company v. Park & Tilford Distillers Corp., D.C., 123 F.Supp. 484, lends support to this rule.

■ The Court finds as a fact that the relationship between the parties was terminable at the will of either party. If the Court is in error in this conclusion and if the relationship of the parties was such as to require reasonable notice, the Court is of the opinion and finds that the preponderance of evidence shows that Anheuser-Busch gave reasonable notice of its intention to terminate before the effective date of termination.

What has been said in the discussion of Issue No. 1 disposes of Issues Nos. 2, 3, 6 and 7. This brings us to Issue No. 4, which involves the conspiracy charge.

■ The essence of a civil conspiracy is concert of action between conspirators

to defraud or cause other injury to person or property which results in damage to a person or property of another. Conner v. Bryce, Sup., 170 N.Y.S. 94, at page 95.

One court has stated that accurately speaking there is no such thing as a civil action for conspiracy; that the better view is that the damage sustained and not the conspiracy is the gist of the action. Dahlquist v. Mattson, 40 Idaho 378, 233 P. 883, at page 886.

One court has stated that all criminal conspiracies are embraced within the civil conspiracies. Martha Mills v. Moseley, 50 Ga.App. 536, 179 S.E. 159.

▆ Criminal conspiracy is a combination or agreement between two or more persons to violate the law or to perform a lawful act in an unlawful manner. The gist of a civil conspiracy seems to be a combination or an agreement between two or more persons to do a harmful, wrongful injury to another person.

▆ Was there a conspiracy between Messrs. Beasley, Lewis, and other representatives of Anheuser-Busch to do a legal wrong to Smoky Mountains? Mr. Beasley came to Knoxville in 1955 without any experience in the beer business. Mr. Brown at that time had experienced a long and successful business career in the beer business. Mr. Beasley's relationship to Mr. Brown in the beer business compared in a way to a green rookie baseball player going to the big leagues in spring training and undertaking to tell a major leaguer who was seasoned in the business how to play baseball. Mr. Beasley felt his inadequacy and was modest enough and frank enough on the witness stand to say so. He listened to the advice of Mr. Brown in relation to the beer business; he was a friend of Mr. Brown; he was a friend of Mr. Carson. There was a social family relationship between the Carson and Beasley families of the most friendly nature which has been testified to during the course of this trial.

Did Mr. Beasley turn on Mr. Brown because of some ulterior selfish motive? The Court does not think so. This record does not show Mr. Beasley to be that kind of a man. Mr. Beasley had a job to do; he was trying to please his superiors and was in a measure successful in doing so until Mr. Lewis came into the picture in January, 1958.

Mr. Lewis was a new broom with this company and apparently he expected to sweep clean. One of the first things he did after making other investigations of other wholesalers in his territory was to investigate Knoxville, and when he investigated Knoxville he became dissatisfied with the Knoxville market. And there is Mr. Beasley, between Mr. Brown, his friend, and Mr. Lewis, his boss. What was he to do? He was to do his duty. He wanted to save his job, of course, so he carried out the instructions the best he could, in the opinion of this Court, of Mr. Lewis.

What were those instructions? They were to do what was necessary to improve the Knoxville beer market insofar as Anheuser-Busch was concerned so that Anheuser-Busch could get up ahead of Schlitz again in the beer business.

Nor does the Court think that Mr. Lewis acted from ulterior motives or illegal motives in dealing with the Knoxville situation. He did what he considered was his duty. It was a clash of personalities between Mr. Brown on the one side, who was a good businessman and is a positive man and who believed, as one can tell from this record, that certain policies should be followed, and Mr. Lewis and his colleagues on the other side who just as strongly believed that opposite policies should be followed.

Who was in the right only time will tell, but that is not for this Court to decide. It was the right of Anheuser-Busch to formulate the policies and if they were not carried out they had the right as heretofore stated to terminate the contract.

The Court finds as a fact that there was no conspiracy upon the part of the defendant or any of the other alleged conspirators named in the complaint.

It is not believed necessary for the Court to analyze the testimony of Mr. Tipton and these distributor salesmen of the Tipton Distributing Company who were formerly with the Smoky Mountains Beverage Company except to say that Tipton wanted this business and he made his desires known to Mr. Beasley and others back in 1957 and 1958 and in due course he filed his application, but there is nothing in this record to show that he acted as a conspirator to commit a wrongful act against Smoky Mountains.

The driver salesman formerly with Smoky Mountains left Smoky Mountains for a sound reason; namely, if they had not left Smoky Mountains and had not gone with Tipton Distributing Company they would not have had a job. So the law of economic preservation caused these drivers to go to Tipton or some other distributor in order to make a living for their familes.

■ This brings us to the final issue in the case which is set forth as Issue No. 8 in the pre-trial order and to which is related in some measure the 5th issue set forth in the pre-trial order. What is about to be said in the discussion of Issue No. 8 will dispose of Issue No. 5.

Issue No. 8 is as follows: "If defendant breached a duty owed to the plaintiff and thereby committed a tort against the plaintiff, what is the amount of damage to which plaintiff is entitled under the tort phase of the complaint?"

The answer to this issue is in the affirmative. This conclusion is reached from that which took place in the conference that was held in St. Louis in November, 1957 in which Messrs. Fogassey, Brown and Carson participated.

As heretofore indicated, Messrs. Brown and Carson made that trip to St. Louis for two specific purposes. First, to discuss draught beer; second, to discuss the persistent rumors coming to Mr. Brown and Mr. Carson with regard to the change of the Knoxville distributorship. These subjects were discussed with Mr.

Fogassey in detail and with precision. Most of the conference was consumed in discussing draught beer.

Mr. Brown told Mr. Fogassy that Anheuser-Busch was insisting on putting in draught beer and that he, Brown, was against it and that he thought Mr. Beasley was against it and wanted to know if the draught beer were put in if split accounts or exclusive accounts would be used in the handling of draught beer.

Mr. Brown also wanted to know whether the handling of draught beer would affect the sale of package beer and also whether Smoky Mountains could make any money on draught beer.

In that connection Mr. Brown specifically told Mr. Fogassey that he was getting rumors that the Knoxville distributorship might be changed, and that if Smoky Mountains was to lose the account Smoky Mountains did not want to go into the draught beer business, and Mr. Fogassey replied "definitely not". He stated to Mr. Brown that draught beer would decrease the sale of package beer and that Smoky Mountains could expect to lost money the first year it was in the draught beer business, but after the first year it could expect to make money.

The statement of Mr. Fogassey inferring that the account would not be changed for at least a year was a misrepresentation of fact which induced Smoky Mountains to inaugurate draught beer. Mr. Brown did not want to put in draught beer. He was led to believe by Mr. Fogassey that if he put in draught beer he would continue as the representative of Anheuser-Busch in the Knoxville area for at least a year or for an indeterminate period.

Draught beer was put in December 1, 1957 and the account was changed as of October 31, 1958, or within a period of eleven months. As a direct and natural consequence of the misrepresentation of fact by Mr. Fogassey, Smoky Mountains suffered damages. The law requires and equity demands that Smoky Mountains be paid for the damages which it sus-

tained as a natural consequence of the misrepresentation of fact of Fogassey.

Anheuser-Busch is legally responsible for the misrepresentation of fact of Fogassey. Conaway v. New York Life Insurance Company, 171 Tenn. 290, at pages 305–306–307, 102 S.W.2d 66, and Stone & Webster, Eng. Corp. v. Hamilton National Bank, 6 Cir., 199 F.2d 127, (a case which originated in this court).

Smoky Mountains is entitled to recover for all damages suffered by it as a natural or proximate consequence of the tort committed by Anheuser-Busch. Tallent v. Fox, 24 Tenn.App. 96, at pages 116–117, 141 S.W.2d 485; Black v. Love & Amos Coal Company, 30 Tenn.App. 377, 206 S.W.2d 432.

A person who is injured by tort of another, in order to recover, is not required to prove his damages with mathematical certainty but is required to prove that he was damaged as a proximate and natural consequence of the tort. Story Parchment Company v. Paterson Parchment Paper Company, 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

The Court finds as a fact that Smoky Mountains suffered the sum of $7,627.43 as damages as a proximate and natural consequence from the tort committed by the defendant and heretofore discussed.

This figure is arrived at by the Court in this manner. The record shows that for the years 1954, 1955, 1956 and 1957, Smoky Mountains made an average net profit per year of $23,675.96, which was a profit of $1,972.99 per month. This figure multiplied by eleven, Smoky Mountains having operated the draught beer business from December 1, 1957 until and including Oct. 31, 1958, is what it would have made if it had not been for the losses incurred in the operation of the draught beer business, namely, a profit of $21,702.89, whereas Smoky Mountains only made a profit during those eleven months of $14,075.46. $14,-075.46 substracted from $21,702.89 leaves a balance of $7,627.43, or the amount of damage to which Smoky Mountains is entitled to recover in this action plus $1,000 which the parties have agreed that Smoky Mountains is entitled to recover because of failure of Anheuser-Busch to ship fourteen cars of beer on which orders had been accepted in October or November, 1958, or a grand total of $8,627.-43.

Mr. Carson, the attorney for Smoky Mountains who prepared the complaint, did not know that Anheuser-Busch had failed to ship fourteen cars of beer on which they had accepted the orders at the time he prepared the complaint. Mr. Brown did not know of that fact at the time he gave his discovery deposition, and counsel for Anheuser-Busch did not know of this fact until it developed during this trial.

The last and final issue is whether plaintiff is entitled to punitive damages, if so, how much.

The Court finds as a fact that plaintiff is not entitled to recover punitive damages in this action.

Let an order be presented in conformity with the views expressed herein.